FIRST CHICAGO CORPORATION AND AFFILIATED CORPORATIONS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
First Chicago Corp. v. Commissioner
Docket No. 31175-88
United States Tax Court
T.C. Memo 1995-109; 1995 Tax Ct. Memo LEXIS 112; 69 T.C.M. (CCH) 2089; March 20, 1995, Filed *112 P, a bank, acquired through a foreign subsidiary a 44.5-percent interest in F, a Brazilian investment bank. Due to various circumstances, including misrepresentations by the president of F, P incurred a loss of its investment in F. Rather than abandon its position in F, P, through another foreign subsidiary, acquired additional stock in F, increasing its holdings to 98 percent and giving P control of F. P acquired a larger share in F with the intent of controlling damage, selling F, and facilitating its decision to stand behind promises made to customers in "comfort letters", which had been sent when F's condition was deteriorating. In addition, by maintaining or increasing its position in F, P stood to benefit in several ways, including tax benefits and the ability to use blocked funds which could not be removed from Brazil or its Central Bank because of a shortage of U.S. currency in Brazil. P claims that the loss from its initial investment in F is a theft loss deductible from ordinary income pursuant to sec. 165, I.R.C. P also contends that the acquisition of F's stock, increasing stock ownership from 44.5 to 98 percent, in substance, should be treated as an expenditure *113 by P to protect its reputation and therefore deductible under sec. 162, I.R.C. P contends that the amount paid for the additional stock in F far exceeded the value of the stock and that the excess was for the purpose of protecting its business reputation. Alternatively, P claims that the expenditure for additional F stock was either a business or bad debt loss under sec. 165 or 166, I.R.C.
R counters that P's initial investment is not a theft loss, but instead a capital loss in the year P sold its interest in F. R, relying on Arkansas Best Corp. v. Commissioner, 485 U.S. 212 (1988), contends that P's motives for acquiring additional F shares are irrelevant and that the expenditures for those shares are not deductible under sec. 162, 165, or 166, I.R.C.
Held: Brazilian law interpreted and P found to be entitled to a theft loss with respect to its initial investment in F. Held, further, Arkansas Best controls in this setting where P acquired a capital interest in F, even though one of P's primary motives for acquisition was to protect its business reputation. The expenditures for the additional stock are not deductible under *114 sec. 162, 165, or 166, I.R.C.
For petitioner: John L. Snyder, Michael M. Conway, and Marilyn D. Franson. For respondent: William G. Merkle, Dana Hundrieser, and James S. Stanis. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined deficiencies in petitioner's 1984 and 1985 income tax in the amounts of $ 2,371,664 and $ 21,828,460, respectively. Separate trials were ordered for the domestic and foreign issues. The issues under consideration here concern petitioner's 1984 acquisition of a 44.5-percent interest in a Brazilian banking institution for $ 14.6 million. The investment was ultimately unsuccessful, and, overall, petitioner expended additional amounts in the form of additional stock purchases in the Brazilian bank exceeding $ 100 million. Petitioner, on its 1986 consolidated corporate Federal income tax return, claimed $ 123,130,294 of expenses in connection with the Brazilian bank. By amendments to its petition in this case involving the 1984 and 1985 taxable years, petitioner, for 1985, claimed a theft loss of $ 14,626,334, representing the cost of the shares initially acquired in the Brazilian bank and $ 116,940,769 as an ordinary *115 and necessary business expense to protect reputation, goodwill, and credit rating, or, alternatively, as a bad debt deduction or a business loss, although the expenditure was in the form of the acquisition of additional stock of the Brazilian bank. We consider the following questions: (1) Whether petitioner is entitled to a $ 14.6 million 1985 theft loss with respect to the stock it purchased in Banco Denasa, a Brazilian bank; (2) whether the approximately $ 117 million [1] paid by petitioner in connection with Banco Denasa was to protect its reputation and is thereby deductible for 1985 under section 162[2] or, in the alternative, whether it is deductible under either section 165 or section 166 as a business or a bad debt loss; and (3) whether any such loss or deduction may be claimed by petitioner's affiliated group for consolidated return purposes. *116 FINDINGS OF FACT [3]
Background -- When the petition in this case was filed, petitioner's principal place of business was Chicago, Illinois. Petitioner, a Delaware corporation, is a bank holding company engaged in the commercial and consumer banking business. Petitioner's primary subsidiary is The First National Bank of Chicago (First National), which is a leading provider of consumer banking services to large corporate clients in the Chicago banking market. For 1984 and 1985, petitioner's total assets were approximately $ 40 and $ 39 billion, respectively, and its net worth was about $ 2 billion. First National began worldwide expansion in the 1970s and operated 76 offices in 39 countries by 1975-76. First National established a representative office in Sao Paulo, Brazil, in 1971, which was limited to making dollar-denominated loans to Brazilian companies from First National's *117 monetary sources outside Brazil. A representative office was not permitted to make local currency loans from Brazilian sources or to otherwise engage in a Brazilian banking business. During the period 1971 through 1982, Brazil maintained the largest economy in South America and the eighth largest economy in the world. By the 1980s, most of First National's competitors had become associated with Brazilian affiliate banks, which were capable of making "local currency loans" and offering their customers other banking products denominated in the Brazilian currency. The decision was made that First National would expand its presence in Brazil by obtaining a minority interest in a Brazilian bank through which First National could receive depostits and make local currency loans. Circumstances Preceding the Acquisition of an Interest in Banco Denasa -- During September 1982, Robert Blocker (Blocker), a broker retained by First National, recommended that a 35- to 40- percent stockholder's interest could be acquired in Banco Denasa (Denasa) for $ 15 to $ 18 million. Blocker considered Denasa to be a "well managed independent Brazilian investment bank." [4] The choices among a total *118 of 38 Brazilian investment banks were slim, in that Denasa and another were the only ones not affiliated with another foreign (non-Brazilian) banking institution. Barry Sullivan (Sullivan), chairman of petitioner's board of directors, and three other officers of petitioner were ultimately the ones recommending to the board that petitioner become involved in Denasa. Blocker was a friend of Sullivan's. During October 1982, Sullivan met with Blocker in Brazil. As of December 1982, Denasa was owned 87 *119 percent by Brazilians and 13 percent by a U.S. bank, Security Pacific National Bank (Security Pacific). Security Pacific first affiliated with Denasa by acquisition of a 20-percent interest in 1974. Security Pacific's investment in Denasa was ultimately unsuccessful due to Brazil's economic problems, which, in turn, caused Denasa's funding, liquidity, and credit problems. Security Pacific also found problems with Denasa's accounting procedures, including the recording of income and expenses and its methods of loan portfolio valuation and reflection of affiliated transactions. Ultimately, during the late 1970s, Security Pacific discontinued its direct involvement in Denasa, ceased using Denasa as an affiliate, and wrote off its investment for accounting purposes. As of May 31, 1983, Denasa's major shareholders were: Denasa Desenvolvimento Nacional S.A. Participacoes (DDN) -- 41.3 percent; Security Pacific -- 11.1 percent; Gebefina, A.G., a Swiss corporation -- 6 percent; other Brazilian interests -- 31.8 percent; and other interests, foreign to Brazil -- 9.9 percent. DDN, in turn, was owned by Baldomero Barbara Neto (Barbara) and Jose Guilherme Padilha (Padilha). Padilha also *120 owned Gebefina, A.G. Padilha served as Denasa's president, and Mario Andreazza was the chairman of the board. Mario Andreazza is the son of a former Senior Minister of the Interior of Brazil. Barbara is the son-in-law of a former president of Brazil, and Padilha is the son-in-law of a former Argentine ambassador to Brazil. Padilha joined Denasa during the early 1970s in the funding function, soon after he acquired a 4.5-percent capital interest through indirect stock ownership. In the early 1980s, Padilha bought a controlling interest in DDN and became president of Denasa. Denasa, during 1983, had about 240 employees located in six Brazilian cities, with about one-half located at Sao Paulo and one- third at Rio de Janeiro. Denasa had a wholly owned subsidiary which functioned to purchase Denasa's certificates of deposit, endorse them to bearer, and sell them to the public at various offices located throughout Brazil. A meeting was scheduled between First National's representatives, Barbara, and Padilha in June 1983. Prior to the meeting, Arthur Massolo (Massolo), head of First National's International Banking Division, met with the president of the Central Bank of Brazil (Central *121 Bank) (the primary banking regulatory agency and implementor of monetary policy) and the Ministers of Planning and of Finance. It was thought that the affiliation between First National and Denasa would be good for both entities. Massolo met with Padilha and Barbara and reached the conclusions that the Denasa transaction "sounded good" and a relationship with Padilha was also acceptable, but Massolo had doubts about being involved with Barbara. Shortly after the meeting, Padilha advised that he would be purchasing Barbara's interest in Denasa. Massolo believed that as long as the "due diligence shows that this is something [First National] should buy", involvement with Denasa should proceed. Petitioner, however, did not charge a formal due diligence team with the evaluation of Denasa. For about 2 months after the June 1983 meeting, representatives of First National were to prepare a feasibility study to cover asset valuation, market analysis, and financial forecast and valuation. Petitioner's analysts acknowledged that realistic financial projections concerning an investment bank were difficult because of the volatile Brazilian economy and because of the variations in the type *122 of business conducted by investment banks. Petitioner's representatives held numerous meetings with Padilha. The initial study was completed during August 1983 and contained, among others, the following conclusions and observations: (1) "That Denasa is basically a sound operation and an appropriate alliance partner for First Chicago"; (2) that Denasa offered many of the benefits that petitioner was seeking; (3) "An anticipated return on equity of 14 [percent] in the first year of operation to 40 [percent] in the 5th year of operation"; (4) Denasa's financial situation was described as "reasonably acceptable", but it was acknowledged that "items in the portfolio will necessitate write-off, and the portfolio in general will need aggressive repositioning"; (5) Denasa's management was described as "basically sound" and Padilha, who controlled Denasa, was keenly interested in alliance with petitioner; (6) operationally, Denasa was found to be essentially sound, but below petitioner's standards; (7) Denasa was considered to be "suffering from an inability to capitalize on existing and potential opportunities", including its inability to raise local and dollar funds due to insufficient *123 capital and lack of a strong financial affiliate, like petitioner; (8) the "expected present value of a 40 [percent] interest in Denasa [was] approximately $ 24 million", and the cost was estimated at between $ 15 million and $ 18 million. Although a number of weaknesses were identified and the authors of the August 1983 report were to some degree unable to verify some of the significant assets and representations in Denasa's financial reports, Denasa was considered a means to gain direct access to the Brazilian banking market. In comparative analyses with 16 other Brazilian investment banks, Denasa was one of the smallest in terms of assets and also had the least or next to the least amount of loan, repass, and related growth activity during 1980 through 1982. Denasa's net profit, return on equity after tax, return on assets before monetary correction, net interest margin, and related aspects were also either the poorest or near to the poorest of the comparable entities. It was estimated that Denasa's banking license was worth $ 12 million and Denasa's value without petitioner's affiliation was generally less than its book value. In addition, petitioner's employees were aware *124 of the profound effect that the volatile Brazilian economy had and could have upon Denasa and the success or failure of any investment in Denasa. Petitioner's employees were also aware that Denasa had been experiencing deteriorating performance in several areas, including local currency net interest margins principally due to nonperforming assets (land and other interest- subsidized assets). During the period when petitioner's feasibility study was being conducted (shortly after June 30, 1983), Denasa published its second quarter financial statements in the principal financial newspapers and submitted them to the Central Bank of Brazil (Central Bank), as required under Central Bank regulations. The financial statements reflected a NCr$ 8.2 billion [5] (about $ 16 million) net worth. Denasa's September 30, 1983, financial statements were published in the principal Brazilian financial newspapers during October 1983. The September 30, 1983, statements reflected a NCr$ 10 billion net worth, an increase of NCr$ 2 billion over the June 30, 1983, statements. *125 During the negotiations between petitioner and Padilha and during the time of petitioner's investigation into Denasa, the Central Bank was evaluating and making inquiry about Denasa's June 30, 1983, financial statements. On May 22, 1984, the Central Bank demanded explanations from Denasa about certain irregularities, including illegal and questionable loans, accrual of interest on nonperforming loans, and reflecting income in the statements at the same time the related expenses were being deferred. On April 2, 1984, the Central Bank, unbeknownst to petitioner, issued a letter to Denasa alleging a negative net worth of more than $ 33 million (NCr$ 17.4 billion) as of June 30, 1983. The Central Bank's letter reflected that the negative net worth was attributable to the bank's examination findings of (1) illiquid assets and/or loans, (2) overvaluation of unused assets, (3) elimination of certain interrelated holdings, and (4) deferred expenses in the approximate amounts of (new cruzeiros in billions) 21.6, .3, 3.1, and .7, respectively, or a total of NCr$ 25.7 billion. The Central Bank allowed Denasa 10 days to increase capital in order to reestablish financial soundness. On May *126 22, 1984, the Central Bank sent another letter to Denasa notifying them to submit a defense, within 30 days, to specific irregularities set forth in the letter. The irregularities set forth in the Central Bank letter, in general, were: (1) Loans made to entities in which Denasa held more than a 10-percent interest; (2) financing granted to financially unsound companies without adequate collateral or guarantees; (3) successive recomposition of overdue debt for purposes of appearance; (4) failing to properly accrue certain aspects of asset transactions; (5) failing to make certain deposits with the Central Bank; (6) failing to include limitations to business use in lending agreements; and (7) failing to eliminate the $ 3.1 million of interrelated holdings referred to in the April 2, 1984, letter. Petitioner was not made aware of that letter by Padilha or Denasa. Discussions in Chicago on August 10 and 11, 1983, between Padilha and petitioner's representatives culminated in an August 12, 1983, memorandum of understanding. The understanding concerned future steps to be taken and, although signed by Padilha and Philip D. Parkinson (Parkinson) for petitioner, was without any binding *127 obligation on the parties. If the transaction occurred: Petitioner was to play a substantial role in the management of Denasa; Padilha represented the value of Denasa to be $ 30.2 million ($ 15.2 million attributable to the bank and $ 15 million to the license to operate as a bank); and petitioner would pay $ 21 million for a 44.5-percent stock interest. After the memorandum of agreement, Padilha continued to negotiate with Elliott Malki (Malki), an employee of petitioner on location in Brazil. Malki advised Parkinson by a September 20, 1983, letter that Padilha was then willing to accept $ 14 to $ 15 million for a 44.5-percent interest in Denasa. About $ 12 million of the proposed purchase price was to be channeled into Denasa to increase its working capital. Also in accord with the memorandum, during August and September 1983, petitioner proceeded to check various additional aspects of Denasa, including third-party appraisals of some real property assets. In a November 17, 1983, acquisition recommendation to purchase Denasa, petitioner's employees indicated that the circumstances surrounding the proposed acquisition were unique and warranted deviation from standard acquisition *128 procedures. Normal prenegotiation procedure was to develop an estimation of value and a negotiating strategy for approval by upper management. This was not done regarding Denasa because the financial condition of Denasa was not readily obtainable. Petitioner also requested its auditors, Arthur Andersen & Co. (Andersen), to perform a limited review or overview of the Denasa transaction by considering the financial data available and making recommendations. The scope of the review envisioned by Andersen resulted in an estimate that the task would consume about 180 hours. In accord with internal policy, petitioner did not hire an investment banker or request a full or comprehensive independent audit of Denasa prior to acquisition of an ownership interest. In a document submitted to the Federal Reserve Bank of Chicago (Federal Reserve) on April 16, 1984, Denasa's working capital was reflected as a negative NCr$ 959,005,000 as of December 31, 1983, which constituted a NCr$ 1,579,739,000 reduction in working capital over the amount calculated as of December 31, 1982. Petitioner was aware that, historically, Denasa's capital base had been inadequate to fund its relatively illiquid *129 portfolio and it also experienced funding difficulties in the market. During November 1983, petitioner's senior management recommended the Denasa acquisition, concluding that the advantages outweighed the disadvantages, and investment in Denasa was approved in spite of Brazilian inflationary, social, political, and related economic problems. In reaching their conclusion, senior management analyzed a worst case situation and recognized that they could lose their entire $ 15 million investment in Denasa. During December 1983, Massolo recommended to petitioner's board of directors that Denasa was an appropriate partner because of its significant unused multinational capacity, relatively small size, strategic fit with petitioner, and the "apparent absence of black holes" in its financial condition and business system. On December 9, 1983, the board approved an investment of up to $ 18 million to purchase up to 50 percent of Denasa. Acquisition of an Interest in Denasa -- Beginning early in 1984, petitioner went forward to actualize its decision to invest in Denasa. Petitioner's Central Bank account had been blocked (dollars could not be repatriated to the United States) due *130 to a lack of dollars available in Brazil. With approval of the Central Bank, petitioner could relend the blocked funds and convert them into an equity interest in a Brazilian company. Accordingly, petitioner's negotiators were seeking to utilize blocked funds in acquiring the interest in Denasa. On January 5, 1984, the parties entered into agreements under which petitioner would acquire 44.5 percent of Denasa, structured as follows: 3 percent of Denasa stock would be acquired by petitioner's domestic subsidiary, First Chicago International Finance Corporation (FCIFC), and 41.5 percent of Denasa stock would be acquired indirectly by FCIFC through First Chicago Participacoes e Empreedimentos Ltda. (FCP), a new Brazilian subsidiary organized by FCIFC. FCP would be capitalized with $ 11,664,000 of petitioner's blocked Central Bank deposits by lending funds to FCP and converting the loans into equity. Denasa's existing shareholders would approve the issuance of new shares, some of which would be purchased by FCP for the new cruzeiro equivalent of $ 11,626,334 (NCr$ 9,096,000,000). Through this transaction and including funds from FCIFC, $ 13.6 million in new capital would be infused *131 into Denasa and DDN, and Padilha would receive a $ 3 million premium. Various aspects of the agreements provided petitioner with involvement and some control over operation of Denasa. The transaction was subject to the approval of the Central Bank and the Federal Reserve, and final approval was obtained by May 14, 1984. Padilha, on behalf of DDN, made the following representations, which he knew to be incorrect: (1) That there were no pending or threatened governmental or administrative actions or proceedings against DDN or Denasa; (2) that Denasa was in compliance with Central Bank requirements; (3) that Denasa's December 31, 1982, and September 30, 1983, financial statements were fairly and accurately presented; and (4) that no material adverse changes had occurred in Denasa's condition since the above-referenced statement dates. Final approval was received from the Central Bank for petitioner to make the investment in Denasa on June 29, 1984, and the investment was made on that day. Petitioner then made public announcements in Brazil of its acquisition of Denasa, and a Denasa/First Chicago logo was also released to the public. Petitioner made the following appointments: Malki *132 and Steven Newcomb as directors of Denasa; Steven Mazzetti to a Denasa corporate post; and Parkinson to oversee petitioner's Denasa investment. On July 19, 1984, unbeknownst to petitioner, Padilha responded to the May 22, 1984, Central Bank inquiry, and, in part, advised the Central Bank that "any distortions that were found will be remedied as short term, as the joint venture with First Chicago has been completed, a fact that will contribute substantially to the performance, growth and stability of Denasa in the national sphere, in view of the increase in our worth to Cr$ 45 billion." In September 1984 and January 1985, petitioner made local currency loans to Denasa totaling $ 21.5 million from petitioner's blocked funds. The Denasa Financial Crisis -- On February 15, 1985, petitioner was made aware of a Brazilian liquidity crisis caused by the failure of several large banks and resulting in depositors' generally seeking stable financial situations, which in turn caused Denasa to encounter difficulty in funding its operations. Brazil, in January 1985, had changed from a military type government to a democracy, and the announced failure of large banks was especially troubling *133 to Brazilians because the prior military regime had not allowed financial institutions to fail. In addition, Brazil's first elected president died early in 1985, shortly before he was to take office. Brazil's monetary inflation rate rose from about 140 percent annually for 1983 to in excess of 200 percent annually for 1985. Denasa's 1984 yearend financial statements were delayed, and when they arrived, irregularities were discovered which petitioner's management began to investigate. Believing that the funding problems were extant throughout Brazil and that foreign investors in other Brazilian banks were making assurances ("comfort letters") to customers, petitioner issued assurances to Denasa depositors encouraging them to maintain their funds in Denasa. At the time of sending the comfort letters, petitioner's management did not expect that petitioner would be required to satisfy the assurances and, as a precaution, obtained reimbursement agreements from DDN and Denasa in case petitioner had to make payments under the assurances. Circumstances continued to deteriorate, and in April 1985 petitioner's senior management went to Brazil and found a rapidly changing situation reflecting *134 a $ 20 to $ 25 million loss for petitioner. By the end of May 1985, petitioner. By the end of May 1985, petitioner had fired the various consultants used in evaluating Denasa, and a group of experienced personnel and new advisers (independent auditors and real estate appraisers) were commissioned to conduct a thorough study of Denasa's capitalization and loan portfolio. At that time, petitioner estimated that Denasa's liabilities exceeded its assets by about $ 100 to $ 110 million. At about the same time, the Central Bank instructed Denasa to increase its capitalization by NCr$ 243 billion (about $ 45 million). Petitioner's president met with a representative of the Central Bank during May 1985 when the problems and some possible options were discussed and the support of the Central Bank was sought in effectuating possible solutions. By May 1985, petitioner expected a $ 20 to $ 30 million capital call by the Central Bank. At the end of May 1985, petitioner's employees, outside auditors, and real estate consultants, after their detailed study, found that many of Denasa's loans were worthless or near worthless and that collateral securing loans was overvalued or nonexistent. *135 The outside auditors concluded that the value of Denasa's loans and other assets was overstated by $ 83 million and that there existed $ 13 million in unrecorded liabilities. If those adjustments were made to Denasa's financial statements, its liabilities ($ 187.1 million) would have exceeded its assets ($ 87.8 million) by $ 99.3 million. At this point, Padilha acknowledged the financial problems of Denasa, and possible solutions were discussed. In this setting, for financial accounting purposes, petitioner wrote off its $ 14,626,334 investment in Denasa as of the first quarter of 1985. By June 1985, petitioner's management determined that Denasa's liabilities exceeded its assets by $ 100 million, and the possibility of insurance recovery was investigated. Petitioner's Course of Action To Deal With the Denasa Dilemma -- Having written off its investment in Denasa, petitioner considered how to extricate itself from Denasa. In this connection, petitioner considered the effect that its actions would have upon its business reputation in the banking community. Petitioner had to decide whether to "walk away" or remain involved in Denasa. In the event that petitioner remained *136 involved, two additional choices were: (1) Obtain control of Denasa for the relatively short-term purpose of paying off liabilities, working out assets, and disposing of Denasa, or (2) obtain control for long-term involvement with Denasa as a going concern. Alternatives were presented to petitioner's board on June 14, 1985, and the following pertinent resolutions were unanimously adopted: (1) A $ 107 million special reserve would be established on petitioner's books to cover expenses connected with the disposition of Denasa and to preserve petitioner's existing goodwill and business reputation; (2) the reserve was available for shortfalls between assets and liabilities, and for contributions to capital, acquisition of additional Denasa ownership, and operating losses; (3) petitioner was to place $ 117 million in its Brazilian subsidiary to effectuate these resolutions; and (4) petitioner's officers were authorized to negotiate and purchase Denasa shares. Massolo was assigned to carry out the board's directives as chief executive officer of Denasa, and he moved to Brazil and, with a team of petitioner's employees, began to deal with the Denasa situation. By mid-June 1985, an agreement *137 was reached with Padilha and DDN under which administrative control of Denasa was to be relinquished to petitioner's employees and Padilha was to assist in the collection of certain loans. In early August 1985, Massolo requested approval to provide $ 46.3 million in interim funding assistance for Denasa from petitioner's Central Bank funds, until petitioner received approval from the Federal Reserve to inject more money into Denasa. The interim loan was to be used for the dual purpose of paying some of Denasa's liabilities covered by the comfort letters and to reduce ongoing funding costs. Only $ 18.6 million of the Central Bank funds was ultimately available for these purposes. Around this time, petitioner became aware of the Central Bank's 1983 special investigation of Denasa and of Denasa's admissions concerning a number of the irregularities discovered. Petitioner also discovered that the Central Bank failed to act regarding the investigative finding, in part, because of Denasa's representations that petitioner's infusion of capital would serve to remedy part or all of the Central Bank's concerns. During August-September 1985 petitioner became aware of the Central Bank's *138 April 2, 1984, letter to Denasa advising of the Central Bank's findings of an approximately $ 33.9 million negative capital situation in Denasa as of June 30, 1983. Petitioner also became aware that Padilha and the Central Bank knew of Denasa's problems and yet allowed petitioner, a foreign purchaser, to become involved in Denasa during 1984. During 1985, petitioner's employees suspected fraud in connection with the 1984 Denasa investment, and there was consultation with legal counsel regarding the Denasa losses and the subject of theft, fraud, or misrepresentation. Ultimately, no formal legal action was pursued. Petitioner did not pursue Padilha civilly or seek criminal action against Padilha because his assistance was needed by petitioner to successfully extricate itself from involvement with Denasa. Additionally, Central Bank was under no legal obligation to disclose Denasa's financial problems to petitioner at the time petitioner acquired its initial interest in Denasa. Ultimately, the Central Bank censured Padilha regarding Denasa's irregularities addressed in the Central Bank's May 22, 1984, letter concerning the June 30, 1983, financial statement of Denasa. Initially, *139 Padilha was fined and banned from association with financial institutions for 5 years, and after a May 1990 appeal, the period he was to be banned was reduced to 2 years, along with a fine. Padilha was not criminally prosecuted by Brazilian authorities in connection with his involvement in Denasa. Petitioner has not received any insurance recovery concerning the Denasa losses. Petitioner, during September 1985, formed First Chicago Empreedimentos Commercials Ltda. (FCEC), a Brazilian foreign subsidiary, to effect a debt-equity conversion of its Central Bank deposits and provide funds to Denasa. On September 13, 1985, petitioner proposed to the Central Bank its plan to inject $ 80 million in capital and $ 32.5 million in interest-free advances from three sources into Denasa. The capital and loans would be funneled through FCEC. On September 18, 1985, final agreement was reached with Padilha and DDN, under which DDN would receive a $ 400,000 payment, a $ 2.925 million loan, and a percentage of collections in exchange for Padilha's assistance in the collection process and his vote for a capital increase enabling petitioner to obtain control of Denasa. The capital increase and *140 purchase of the new capital by petitioner was intended to dilute the holdings of DDN, Padilha, and others. Accordingly, petitioner, through its subsidiary, FCEC, would acquire the new shares and the amount paid would, for the most part, be available to fund Denasa's operations, including improvement of the negative capital situation. FCEC was used by petitioner during 1985 to transfer assets to Denasa and Padilha, for avoidance of certain Brazilian taxes and other transactions. FCEC incurred expenses of $ 3.633 million (which were reimbursed by petitioner's domestic subsidiary) and paid petitioner interest of about $ 1.4 million for 1985. FCEC legally existed and operated under the laws of Brazil. By the end of September 1985, petitioner had some day-to-day operating control over Denasa; losses were continuing to mount, petitioner no longer trusted Padilha; and an internal debate was continuing within petitioner as to whether it was advisable to attempt to continue operating Denasa either on a short- or long-term basis. Petitioner planned to convert $ 37.1 million [6] of Denasa's debt to equity, and the $ 79.84 million balance of petitioner's capital infusion into Denasa would *141 be composed of blocked Central Bank deposits. Approval was obtained from the Federal Reserve for petitioner to inject up to $ 192 million of funding into Denasa. On November 6, 1985, the Central Bank confirmed the approval for petitioner, as a foreign entity, to assume temporary control over Denasa, but the Central Bank reserved the right to decide what type of managerial control could ultimately be transferred to any third-party buyer of Denasa. As of November 12, 1985, petitioner formalized its plan to own, by the end of November, about 98 percent of Denasa and to sell Denasa as quickly as possible. It was recognized, however, that Denasa's financial condition would have to be improved and that "select interim businesses" of Denasa would have to be maintained in order to be able to sell Denasa. The maintenance of business and improvement of Denasa were also to protect petitioner *142 if the sale of Denasa took longer than planned. By the use of petitioner's line of credit, various of Denasa's banking activities would be provided a competitive advantage to engage in higher quality lending in local currency. There were plans to collect Denasa's outstanding loans and to improve and maintain control of Denasa's expenses and operations. After petitioner injected funds into Denasa, the earnings gap began to shrink and the negative net worth was reduced to $ 17 million, along with a $ 125 million annual net loss as of December 31, 1985. External Brazilian banking conditions, however, worsened. In late November 1985, the closing and liquidation of several financial conglomerates caused more flight to quality by Brazilian investors, motivating petitioner's January 1986 formulation of an offering memorandum to sell Denasa. In addition, at that time, petitioner was contesting a $ 12 million proposed tax deficiency before the Central Bank, which was ultimately resolved in June 1986 for $ 500,000. In January 1986, Denasa continued to experience negative net worth, but petitioner recognized that two assets had value -- the banking license and rights to repatriate foreign *143 capital, which petitioner believed had a combined value ranging from $ 15 to $ 22 million. These rights could only be transferred to a buyer of Denasa's stock. On January 9, 1986, petitioner advised the Federal Reserve that Denasa would ultimately be liquidated if petitioner could not find a buyer. In April 1986, although continuing to attempt to sell Denasa as quickly as possible, petitioner revised its plan regarding measures to further reduce costs and enhance revenues of Denasa. In addition, petitioner considered transfer of Denasa's problem assets to another entity in order to make Denasa more salable. Finally, methods to improve Denasa's undercapitalization problems were explored. During April 1986, serious discussions concerning the sale of Denasa began between petitioner and Banca Nazionale del Lavoro (BNL), an Italian bank. BNL insisted that Denasa's net worth deficit be eliminated and the number of employees reduced prior to any sale. Petitioner made arrangements to sell Denasa to BNL, and about $ 16.186 million was paid to eliminate the remainder of Denasa's negative net worth. On June 4, 1986, a final agreement was executed for the sale of Denasa to BNL for $ *144 10 million. OPINION Petitioner's involvement in Denasa resulted in the loss of its $ 14.6 million investment and the expenditure of an additional $ 117 million. Petitioner argues that it is entitled to a $ 14.6 million theft loss under section 165. It is contended that the theft was discovered in 1985 when petitioner became aware of misrepresentations made by Padilha that had induced the purchase of an interest in Denasa. Petitioner also claims a $ 117 million loss under section 162 for expenditures during 1985 to protect its banking reputation in connection with the failure of Denasa. In the alternative, petitioner argues that at least $ 106.5 million of its payments during 1985 are deductible as bad debts under section 166 or as business losses under section 165 because the payments were made in satisfaction of petitioner's obligations under the comfort letters or guarantees issued by petitioner to Denasa's depositors prior to discovery of Denasa's insolvency. Respondent contends that no theft loss is allowable for the $ 14.6 million investment in Denasa because a theft did not occur within the meaning of Brazilian law. With respect to the $ 117 million loss, respondent contends *145 that it is not allowable under section 162 because it constitutes an investment in stock and is not deductible as an investment to protect petitioner's business reputation. Respondent contends that, in form and substance, petitioner's expenditures were stock investments that are governed by section 1221. Finally, respondent contends that petitioner may not consolidate losses attributable to foreign subsidiaries in the 1985 consolidated return because the subsidiaries are not part of petitioner's affiliated group for purposes of reporting consolidated income and deductions. There is no dispute about whether a loss occurred. Section 165 -- The Claimed Theft Loss -- Section 165(a), in general, allows a deduction for losses "not compensated for by insurance or otherwise." Section 165(e) provides that theft losses shall be "treated as sustained during the taxable year in which the taxpayer discovers such loss." See also secs. 1.165-1(d)(3), 1.165-8(a)(2), Income Tax Regs. The term "theft" for purposes of section 165 is defined to include, but not be limited to, larceny, embezzlement, and robbery. Sec. 1.165-8(d), Income Tax Regs.
In Edwards v. Bromberg, 232 F.2d 107, 110 (5th Cir. 1956), *146 the term "theft" as used in section 23(e)(3) of the Internal Revenue Code of 1939 was defined to cover "any criminal appropriation of another's property to the use of the taker, particularly including theft by swindling, false pretenses, and any other form of guile." (Fn. ref. omitted.) See also Rev. Rul. 71-381, 1971-2 C.B. 126, 127. Whether a theft occurred must be determined under applicable local law. Edwards v. Bromberg, supra at 111; Paine v. Commissioner, 63 T.C. 736, 740 (1975), affd. without published opinion 523 F.2d 1053 (5th Cir. 1975); Muncie v. Commissioner, 18 T.C. 849 (1952). An actual conviction, however, is not a prerequisite for a theft loss deduction. Paine v. Commissioner, supra at 740; Vietzke v. Commissioner, 37 T.C. 504 (1961). The parties agree that Brazilian law may be used to determine whether a theft occurred. The parties have also agreed on a translation of pertinent Brazilian law, and we begin by quoting the germane portions: *147 Brazilian Penal Code
Article 155. [Theft] To misappropriate, for oneself or for a third party, someone else's movable property: * * * Para. 3. Movable property shall be deemed to include electric power or any other property of economic value. Qualified theft
* * * II - by breach of confidence, or by means of fraud, assault or cunning;
* * * Article 171. [Larceny by fraud] To obtain, for oneself or for a third party, an illicit advantage, to the prejudice of a third party, by inducing or leading someone into error, by artifice, trick or any other fraudulent means:* * * * * *
Chapter III Falsidade Documental [Falsification of Documents] False Representation or Misrepresentation
Article 299. To omit, in a public or private document, a statement that should be included, or to insert or cause to be inserted therein a false statement or one that diverges from what should be written, for the purpose of damaging a right creating an obligation or altering the truth as regards a juridically relevant fact: * * * Brazilian Civil Code
Article 86. -- Legal acts are subject to defeasance when the statements of volition *148 stem from substantial error. Article 87. -- Substantial error is error that involves the essence of the act, the principal object of the statement, or certain of the qualities inherent thereto. * * * Article 92. -- Legal acts are subject to defeasance due to malice of intent, when such malice is the cause thereto. * * * Article 94. -- As to bilateral acts, the intentional silence of one of the parties regarding a fact or quality that is unknown to the other party constitutes fraudulent omission, when it can be proved that without such omission the agreement would not have been concluded.
The parties focus mainly on articles 171 and 299 of the Brazilian Penal Code to determine whether petitioner is entitled to a theft loss under section 165. The elements necessary to prove a violation of article 171 are: (1) The perpetrator must gain an illicit advantage for himself or another; (2) the advantage gained must be to the prejudice of the victim; and (3) the victim must be led into error by means of some fraudulent artifice. Article 299 contemplates (1) either an omission of a necessary statement, or a false statement, concerning an essential fact, (2) made *149 with intent to cause a loss to a person who is misled by the statement or the omission. Respondent argues that violation of article 299 concerns interference with the contents of an existing document and that an omission from a document would not be a violation of article 299. In other words, respondent contends that an article 299 violation can occur only where the contents of a document are false and/or altered. Accordingly, under respondent's interpretation, petitioner would have to show that Denasa's balance sheets and/or financial statements were intentionally false. Petitioner contends that the use of the word "omit" in article 299 defies respondent's interpretation. Further, the experts on Brazilian law did not preclude an omission as an element in the violation of article 299; instead, the commentary simply emphasized the interference aspect of the law. We read article 299 as pertaining to an omission of an item required to be shown or the insertion of a false item, either of which would cause the document to be false or a misrepresentation of what it should have been. We see no significant difference for purposes of this case and hold that the elements of article 299, *150 if proven, would be sufficient for purposes of sustaining a "theft" loss under section 165. Petitioner has shown that Padilha was aware that the June 30, 1983, and subsequent financial statements did not represent the true financial status of Denasa. Further, in connection with the guarantees or representations made in the Share Purchase Agreement, Padilha was aware of and did not disclose to petitioner the various Central Bank proceedings and letters of inquiry concerning determined or asserted violations pending at the time of the agreement and subject transaction. Respondent, on the other hand, contends that petitioner was generally aware of Denasa's shortcomings but went forward and became involved in Denasa because it served petitioner's business goals to do so. We must decide whether petitioner was aware of Denasa's true condition and, if not, whether that true condition was intentionally kept from petitioner by Padilha. Within the context of that inquiry, we must also decide whether petitioner's reliance on the reflected financial condition played a part in the inducement and decision to invest. To be sure, petitioner was aware of some of Denasa's shortcomings and financial *151 deficiencies. Petitioner decided to acquire an interest in Denasa, being aware of Denasa's and Brazil's financial problems, because of its desire to be involved in Brazil's local currency banking market. Respondent attempts to paint this scene as one where petitioner was aware of the lack of value in Denasa or, if unaware, did not take care to find out the true extent of Denasa's financial problems. To the extent that petitioner may have facilitated the theft due to negligence, however, it is not a bar to a theft loss deduction. Nichols v. Commissioner, 43 T.C. 842, 886 (1965). The fact that petitioner did not follow its usual procedures or perform due diligence regarding its investment in Denasa, standing alone, is not determinative. Petitioner was aware of the Brazilian political and financial volatility and that it was difficult to develop and analyze realistic financial projections for an investment bank. Petitioner was aware of weaknesses and inadequacies in Denasa, but overall it was thought that the weaknesses could be remedied. In this regard, petitioner was willing to become involved in Denasa, in spite of the identified weaknesses, *152 because an investment of approximately $ 15 million would provide access to the Brazilian banking market and permit petitioner to do business in local currency in the same manner as its competitors. In summary, petitioner was informed that Denasa's financial statements were likely, to some extent, overstated. Petitioner, however, was not aware that Denasa's financial statements were so misstated that rather than a positive net worth of $ 16 million, there was actually a negative net worth of about $ 33 million. During the preliminary negotiations with Padilha, Denasa's June 30, 1983, second quarter financial statements were published reflecting a net worth of about $ 16 million. During October 1983, Denasa's September 30, 1983, financial statements reflected a 25-percent increase in net worth. These financial statements were published and also submitted to the Brazilian regulatory banking authority and were relied upon by petitioner's employees in the evaluation of Denasa. Padilha did not advise petitioner, although contractually obligated to do so, that the Brazilian regulatory banking authority questioned the June 30, 1983, financial statements and on April 2, 1984, advised *153 Denasa in writing of specific inadequacies which would reflect a $ 33 million negative net worth. Other correspondence and meetings concerning Denasa's inadequacies occurred contemporaneously with the negotiations and prior to petitioner's investment in Denasa, and Padilha kept that information from petitioner. The failure to advise of the Central Bank's investigation or inquiries and its letters setting out specific deficiencies, including a negative capital situation, coupled with Padilha's knowledge that values set forth in Denasa's June 30, 1983, financial statements were untrue, causes us to hold that petitioner was intentionally misled by Padilha and that Padilha and Denasa knowingly misrepresented and concealed material financial information in violation of article 299 and the terms of the Share Purchase Agreement. Likewise, article 171 was violated in that Padilha gained an illicit advantage for himself and others to the prejudice of petitioner, who was led into "error" by means of Padilha's fraudulent artifice. Accordingly, petitioner has shown entitlement to theft loss treatment for its $ 14.6 million investment under section 165 in 1985, the year in which petitioner *154 discovered that the omissions and misrepresentations had occurred. [7]
Around the time (September 1985) when petitioner discovered Padilha's misrepresentations and that the financial statements were untrue, Denasa's net worth was negative in amounts ranging from $ 25 million to over $ 100 million. Petitioner, for the 1985 tax year, claims a theft of its $ 14.6 million investment to acquire a 44.5-percent interest in Denasa. Even though Denasa did not cease operations and even though Denasa's ability (license) to conduct banking business in local currency may have had residual value, that value of $ 10 million to $ 12 million was far less than the amount by which liabilities exceeded assets. Accordingly, petitioner is entitled to claim a loss in the total amount of its investment in Denasa ($ 14.6 *155 million) for 1985 (the year the theft was discovered). The Additional Investment in Denasa -- With respect to the $ 117 million paid in connection with the continued involvement in Denasa, petitioner argues that it is entitled to a deduction under section 162 as an ordinary and necessary business expense to protect its reputation. Petitioner's argument is, of necessity, one seeking to prefer substance over form because the form of the expenditure was the purchase of additional Denasa shares. Respondent, relying most heavily upon the holding of Arkansas Best Corp. v. Commissioner, 485 U.S. 212 (1988), contends that the transaction here is "virtually identical" in all pertinent aspects to that in Arkansas Best and that the loss should be one attributable to a capital asset within the meaning of section 1221. Prior to the decision in Arkansas Best, a seminal case involving the definition of capital asset was Corn Products Refining Co. v. Commissioner, 350 U.S. 46 (1955). The taxpayer in that case was seeking capital gains treatment for gains derived from dealings in corn futures. The Supreme Court, however, *156 held that the transactions were hedging transactions designed to protect against price fluctuations in the principal raw material of the taxpayer's manufacturing operation, and, consequently, the corn futures were excluded from the definition of capital asset in section 117, I.R.C. 1939 (predecessor of section 1221). In reaching that conclusion, the Supreme Court indicated that the corn futures contracts assured a ready supply for the taxpayer's manufacturing requirements, thus stabilizing the cost of its inventory. The result in Corn Products appears to flow from the congressional design that gains or losses from increase or decrease in the value of property governed by market forces should be capital, and that profit and loss on assets used in business activity should be ordinary in character. Corn Products spawned a series of cases in which courts permitted ordinary loss treatment to taxpayers who could show that an asset was acquired for a business purpose rather than for an investment purpose. See, e.g., W.W. Windle Co. v. Commissioner, 65 T.C. 694 (1976); Wright v. Commissioner, 756 F.2d 1039 (4th Cir. 1985), *157 affg. T.C. Memo. 1983-707; Campbell Taggart, Inc. v. United States, 744 F.2d 442 (5th Cir. 1984); Dearborn Co. v. United States, 195 Ct. Cl. 219, 444 F.2d 1145 (1971). The central holding of Arkansas Best is "that a taxpayer's motivation in purchasing an asset is irrelevant to the question whether the asset is 'property held by a taxpayer (whether or not connected with his business)' and is thus within § 1221's general definition of 'capital asset.'" 485 U.S. at 223. The Arkansas Best holding called into question the continuing vitality of many of the business purpose cases decided in reliance on Corn Products. [8]
*158 There is no dispute that petitioner, through subsidiaries, acquired additional stock of Denasa, so that the amount of such stock it owned, directly or indirectly, increased from 44.5 percent to about 98 percent. If one of the principal purposes for buying the stock was to fund Denasa in order to make good on petitioner's guarantees or comfort letter promises, should that remove this case from the holding of Arkansas Best? We think not. Arkansas Best concerned a situation substantially similar to this case. The taxpayer there was a diversified holding company that had acquired a 65-percent stock interest in a bank. After the bank experienced financial difficulties, the taxpayer injected capital by acquiring additional stock without increasing its ownership percentage. The stock was acquired to protect the taxpayer's own business reputation, a business rather than investment purpose. See Arkansas Best Corp. v. Commissioner, 83 T.C. 640, 656 (1984). Later the taxpayer sold most of its bank stock, leaving it with a 14.7-percent interest, and an ordinary loss was claimed. Section 1221 broadly defines a capital asset as "property held by *159 the taxpayer (whether or not connected with his trade or business)". Section 1221 also contains five specific exceptions from the general rule, none of which is applicable in this case. On the authority of Arkansas Best, we conclude that the stock acquired by petitioner (or by its subsidiaries) was a capital asset within the meaning of section 1221. Petitioner, however, argues that in substance this was not a purchase of stock and that it was essentially a payment to protect its reputation. Petitioner's argument operates in a serpentine fashion, attempting to elude capital treatment under section 1221 and Arkansas Best. First, petitioner argues that the acquisition of Denasa's stock should be characterized in accord with the economic substance of the expenditures. [9] In that regard, petitioner contends that even though the consideration was exchanged for stock, the underlying purpose was to protect petitioner's reputation and/or to pay depositors of Denasa to whom petitioner had provided comfort letters. In this connection, petitioner asks to be allowed a deduction as though the payment had been made directly to petitioner's creditors, when, in fact, the payments were *160 to purchase stock, and it was Denasa that used the infusion of capital partly to pay depositors. Second, petitioner contends that the amount paid was in excess of the value of Denasa's stock acquired by petitioner. And, finally, petitioner argues that the excess value paid to Denasa was for the purpose of protecting its reputation. In summary, petitioner argues that its continued involvement in Denasa was to protect its reputation, and the amount paid far exceeded the value of the Denasa stock received. Petitioner points out that, in substance, it *161 could not have been making a capital investment because it paid about $ 117 million in exchange for shares in Denasa at a time when Denasa's financial circumstances were rapidly declining and when Denasa had as much as a $ 100 million or larger capital deficit. In addition, Denasa was ultimately sold for $ 10 million when its capital was presumably near zero, an amount which was less than petitioner's original $ 14.6 million capital investment and approximated the value a foreign bank would have placed on Denasa's license or ability to conduct business in Brazil. Respondent counters that petitioner's payment caused an increase in its shareholdings from less than half to nearly 100-percent control of Denasa. Respondent also emphasizes that, by purchasing Denasa's shares, petitioner was able to obtain the benefit of freeing blocked funds with the Central Bank. Also, if petitioner had been successful in rehabilitating Denasa and/or Denasa had become profitable, petitioner, as equity holder, would have benefited both from the income and/or any possible increase in Denasa's value. Petitioner relies on a line of cases, along with one of the Commissioner's revenue rulings, all involving *162 payments to protect business reputation. [10] Respondent does not disagree with petitioner's legal position; i.e., that payments to protect business reputation are, in general, deductible. Instead, respondent argues that the line of cases and the ruling are factually distinguishable and do not supersede the holding of Arkansas Best. The core of petitioner's legal position rests on Majestic Sec. Corp. v. Commissioner, 120 F.2d 12 (8th Cir. 1941), affg. 42 B.T.A. 698 (1940); New Hampshire Fire Ins. Co. v. Commissioner, 2 T.C. 708 (1943), *163 affd. 146 F.2d 697 (1st Cir. 1945); and Rev. Rul. 73-226, 1973-1 C.B. 62. The authorities relied upon by petitioner predate the Supreme Court's Arkansas Best holding. Some of them indicate that if the price paid exceeds an asset's fair market value, the excess is not necessarily to be attributed to the asset. In Majestic Sec. Corp. v. Commissioner, supra, the trial and appellate courts both upheld the Commissioner's determination that the taxpayer's basis in securities purchased from a bank was less than the amount the taxpayer paid because the taxpayer paid more than the prevailing market prices of the securities, most of which were listed on exchanges. The U.S. Court of Appeals for the Eighth Circuit regarded it as a "reasonable inference" that the excess purchase price was paid to improve the condition of the bank, some of whose shareholders also owned stock in the taxpayer, and thus that the excess price was not part of the cost of the stock. Majestic Sec. Corp. v. Commissioner, supra at 14. Likewise, in New Hampshire Fire Ins. Co. v. Commissioner, supra, *164 the trial and appellate courts, relying on Majestic Sec. Corp. v. Commissioner, supra, both upheld the Commissioner's substance-over-form determination that the taxpayer's basis in stock repurchased from its agents was less than the amount paid because the price exceeded the established value of the stock. Rev. Rul. 73-226, 1973-1 C.B. 62, is entitled "Insolvent foreign subsidiary bank" and concerns the following pertinent factual premises: (1) The taxpayer, a domestic corporation in the banking business, acquired 55 percent of the voting stock of a foreign bank (X); (2) the taxpayer subsequently learned that X had sustained losses in excess of its capital; (3) many of X's customers are also the taxpayer's customers; (4) in order to protect its own reputation and goodwill and at a time (in 1971) when X's stock was worthless, the taxpayer made payments to or for the benefit of X's creditors, pursuant to a court-supervised plan for the composition of their claims; (5) the taxpayer was to pay an amount equal to that portion of X's total acknowledged liabilities that could not be paid from X's assets; and (6) *165 the taxpayer was to receive an assignment of X's assets that were not liquidated or were otherwise on hand at the closing of the plan proceeding -- this aspect was characterized as the taxpayer's subrogation to the rights of X's creditors. The ruling, focusing on section 162, in pertinent part contains the conclusions that (1) Amounts paid by the taxpayer directly or indirectly to depositors and other creditors of X are deductible by the taxpayer in the year or years in which paid as ordinary and necessary business expenses under section 162(a) of the Code, to the extent such amounts exceed the value of the assets acquired by the taxpayer under the Plan. * * * (4) The taxpayer's total investment in X's stock is deductible as a long-term capital loss in 1971 under the provisions of section 165(g) of the Code. [ Rev. Rul. 73-226, 1973-1 C.B. at 63-64.]
The underlying rationale of the ruling is similar to the principle contained in Majestic Sec. Corp. v. Commissioner, supra, in that, to some extent, the payment was to protect business reputation and was in excess of the value or not in exchange for *166 a capital asset. Respondent does not disclaim the position of the ruling or express disagreement with the cases cited therein but, instead, argues that the facts here are distinguishable as follows: (1) Petitioner did not make the payments either solely or primarily to protect its reputation; (2) petitioner believed it would receive equal value in exchange, including full control of Denasa and the right to receive income from Denasa; (3) petitioner purchased stock (a capital asset here), whereas the taxpayer in the ruling, as part of a court-supervised plan, made payments for the sole purpose of satisfying X's creditors without purchasing anything in exchange, acquiring an interest in X's assets not by purchase but by way of subrogation; and (4) petitioner's payment was motivated by possible tax benefits and it also obtained the benefit of using funds blocked in the Brazilian Central Bank. We agree with respondent that the ruling, insofar as it allowed a business deduction under section 162, is distinguishable on its facts, even though we recognize that petitioner expected that some portion of the capital that it contributed to Denasa in exchange for stock would ultimately be used *167 to satisfy petitioner's comfort letter promises and to protect petitioner's reputation. Additionally, we find that the outcome here is controlled by Majestic Sec. Corp. v. Commissioner, supra, or New Hampshire Fire Ins. Co. v. Commissioner, supra.
Petitioner characterized its choices after writing off the $ 14.6 million investment in Denasa as walking away or becoming involved in order to protect its own reputation. That characterization does not present a complete or unbiased picture. We find that petitioner chose to take control of Denasa not only to protect its business reputation, but also in the hope of receiving the other benefits outlined by respondent. Petitioner expected to improve Denasa's financial situation by cleaning up assets, collecting receivables, reducing costs, and either reducing losses or making profits. Only a portion of the capital contributed by petitioner was used to pay creditors. The ultimate goal was to sell Denasa, but, unless and until a buyer could be found, petitioner retained a capital stake in Denasa. And if Brazilian economic conditions had improved, petitioner was in *168 a position to remain in control and reap any benefits from its investment in Denasa as Denasa's 98-percent shareholder. Considering these circumstances, petitioner's arguments are undermined by the Supreme Court's holding in Arkansas Best Corp. v. Commissioner, 485 U.S. 212 (1988), and fail to harmonize with the congressional intent underlying section 1221. In this regard, "'a transaction is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred.'" Don E. Williams Co. v. Commissioner, 429 U.S. 569, 579 (1977) (quoting Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 148-149 (1974)); Hitchins v. Commissioner, 103 T.C. 711, 719 (1994). Although it was one of petitioner's significant purposes to protect its reputation, we cannot, in these circumstances, ignore that in exchange for its payments it received stock, a capital asset. Put in the vernacular, petitioner wishes to have its cake and eat it, too. Had petitioner made the payments directly to depositors to protect its reputation, *169 section 1221 and Arkansas Best would not have come into play. But having purchased the additional stock and obtained control, along with the other benefits or value of stock ownership, petitioner is faced with section 1221, as construed in Arkansas Best. Petitioner's motivation in making a payment to acquire additional capital stock and control of Denasa is, accordingly, irrelevant to the question whether that stock is "property held by a taxpayer (whether or not connected with his business)" and is thus within the general definition of capital asset in section 1221. Arkansas Best Corp. v. Commissioner, supra at 223. We conclude that the payment was made in exchange for a capital asset and is not deductible under section 162 as an ordinary and necessary expense of petitioner's business. Sections 166 or 165 -- Alternatively, Is Petitioner Entitled to Either a Bad Debt or Business Loss? With respect to its section 166 bad debt argument, petitioner contends that the payments of $ 117 million were actually made to Denasa to pay liabilities to depositors. Petitioner, as a fallback position, argues that, at the very least, the $ 21.5 *170 million directly lent to Denasa during 1985 would meet the section 166 bad debt definition because of Denasa's $ 100 million capital deficit at that time. In fact, however, petitioner did not pay the $ 117 million to depositors, but instead paid that money to Denasa in return for a controlling interest in the latter's stock. Nor did Denasa use the whole of the $ 117 million for payment of liabilities to depositors. The $ 21.5 million that petitioner lent to Denasa was converted to stock in the overall recapitalization and acquisition of control over Denasa by petitioner. Accordingly, we find that petitioner is not entitled to a bad debt loss. Petitioner's section 165 business loss argument must also fail because it would also require us to ignore the acquisition of Denasa's stock and to treat the payments or transfers for stock as losses in 1985, whereas petitioner remained in control of Denasa into 1986 when the ownership in Denasa was sold. It is also noted that petitioner originally claimed these losses on its 1986 return. Which Corporate Entity is Entitled to Claim the Redetermined Losses? -- Finally, we consider respondent's argument that petitioner is not entitled *171 to claim the losses because FCP and FCEC, petitioner's Brazilian subsidiaries, incurred the losses (capital or ordinary). Respondent contends that the losses cannot be combined with the consolidated group income because petitioner's foreign subsidiary is barred from being part of the consolidated group. Section 1504(b)(3) specifically excludes foreign corporations from being a part of the affiliated group for consolidated return purposes. Moreover, respondent argues that we should not disregard the corporate form and separate entity status of FCP and FCEC, the Brazilian entities formed by petitioner. If a corporation is formed for a business purpose, or if it carries on a business after incorporation, its corporate form is generally recognized for tax purposes. Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 438-439 (1943); National Carbide Corp. v. Commissioner, 336 U.S. 422 (1949). More specifically, respondent refers to a case where the Court respected for tax purposes a foreign corporate entity that complied with foreign law. Elot H. Raffety Farms, Inc. v. United States, 511 F.2d 1234 (8th Cir. 1975). *172 Respondent contends that the two foreign corporate entities were formed: (1) To engage in commercial activities, (2) to permit the use of blocked funds, (3) to limit petitioner's risk in Brazil, and (4) to further petitioner's plans to obtain tax benefits (FCP) and to improve petitioner's position regarding Denasa. Petitioner contends that respondent is wrong as a matter of fact and law. Petitioner contends that the facts concerning each entity must be separately considered because the legal principles differ and because in each instance the loss is attributable to petitioner (a member of the affiliated group for consolidated purposes). Regarding the $ 14.6 million initial stock investment in Denasa, petitioner (through FCIFC, a domestic corporation and a member of the consolidated group) organized FCP, a Brazilian subsidiary. FCP, in part, was capitalized with $ 11,664,000 of petitioner's blocked Central Bank deposits by lending funds from petitioner's consolidated group to FCP and converting the loans into equity. Denasa's existing shareholders approved issuance of new shares, some of which would be purchased by FCP for the new cruzeiro equivalent of $ 11,626,334. By use *173 of FCP, $ 13.6 million in new capital would be infused into Denasa, with DDN and Padilha receiving a premium of $ 3 million. Petitioner contends that Padilha was the reason for and primary beneficiary of FCP's existence, because direct acquisition of Denasa stock by petitioner would not have resulted in a premium ($ 3 million) for DDN and Padilha. More importantly, petitioner contends that it suffered the theft loss because the negotiations, agreement, and purchase were based upon misrepresentations made to petitioner. In other words, petitioner argues that FCP was a mere instrumentality utilized to effect the agreement of the parties. Moreover, the funds that ultimately were lost by means of the investment were petitioner's. Although petitioner makes several other arguments citing various precedent and statutes in support thereof, we see this simply as a pure factual matter. Petitioner formed FCP and through it invested in Denasa, in part, due to Padilha's misrepresentations, which constituted theft within the meaning of section 165(c)(3) and (e). For purposes of a theft loss, we generally do not consider whether an asset would have produced capital or ordinary gain or loss. *174 Instead, the focus is upon the fact that a taxpayer parted with consideration because of trickery and deceit (theft). In other words, FCP did not part with any part of the $ 14.6 million due to the misrepresentations of Padilha; instead, FCP was, in effect, a conduit in the transaction in which petitioner parted with its money. See sec. 1.165-1(c), Income Tax Regs. Accordingly, with respect to the entire $ 14.6 million lost in connection with petitioner's initial investment in Denasa, including the part of the investment made through FCP, that loss is deductible in connection with petitioner's affiliated group's consolidated report of income. With respect to any part of the $ 117 million expended for additional stock in Denasa, it is unnecessary to decide whether any loss may be part of the 1984 or 1985 consolidated returns because no loss may be recognized before 1986 when the Denasa stock was sold. That is so because of our holding that petitioner acquired a section 1221 capital asset (Denasa stock), which was sold during 1986, a year over which we do not have jurisdiction in this case. To reflect the foregoing, An appropriate order will be issued. Footnotes
1. $ 116,940,769↩
2. Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Some of the facts have been stipulated, and the stipulations of facts and attached exhibits are incorporated by this reference.↩
4. Brazilian investment banks were established to provide medium-term (180 to 720 days) working capital and investment finance. Investment banks engaged in three basic types of transactions: (1) Lending funds raised by placement of the bank's certificates of deposit in local capital markets; (2) "on-lending" or "repassing" foreign capital to domestic borrowers; and (3) merchant banking activity, including securities underwriting, trading, and brokering. Investment banks were not permitted to receive demand deposits.↩
5. "NCr$" is used throughout as an abbreviation for the term "new cruzeiro", which is the monetary unit of Brazil.↩
6. Of this debt, $ 21.5 million consisted of the local currency loans petitioner made to Denasa during September 1984 and January 1985.↩
7. Our holding that petitioner has established that a "theft" occurred under Brazilian law, and accordingly within the meaning of sec. 165↩, makes it unnecessary to consider whether a "theft" occurred under Illinois law.
8. The Supreme Court did not overrule the holding in Corn Products Refining Co. v. Commissioner, 350 U.S. 46 (1955). Instead, Arkansas Best Corp. v. Commissioner, 485 U.S. 212 (1988), reconciled the Corn Products rationale by explaining that the hedging transactions as described in Corn Products fit within the inventory exception to sec. 1221. See, e.g., FNMA v. Commissioner, 100 T.C. 541, 572-579 (1993); sec. 1.1221-2T, Temporary Income Tax Regs., 58 Fed. Reg. 54039↩ (Oct. 20, 1993).
9. Petitioner contends that it is not disavowing the form or asking us to find a form petitioner did not choose, but that, instead, the transaction be given tax treatment in accord with its true substance. Under these circumstances, petitioner believes that it does not come within prohibitions against recharacterizing the form of its own transactions. See Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134↩ (1974).
10. Respondent's revenue rulings are generally afforded no greater legal weight than is afforded to a litigating party's position. We do not depart from that practice here, but feel compelled to consider and reconcile this ruling with the facts and circumstances of this case because it has provided public guidance for more than 20 years and is remarkably similar to the circumstances of this case.↩